I wanted to thank you first for hearing me because I've been on this case for about seven and a half years, and from the date that I got on, I knew it was going to be a tough battle when the court threatened to hold me in contempt, and then knocked me off the case, then brought me back. It's been a tough battle, and we realized the horrific nature of the crime that was committed by Alex Mendoza, and how emotional the crime was. And what we've been trying to figure out, what I've been trying to figure out, is what did Mr. Cox do? And when I look at the court of appeals reasoning, there doesn't seem to be anything that showed Mr. Cox had anything to do with what happened. He lived in the house, he knew Mr. Cox, Mr. Mendoza, he worked with him. At least he admitted to giving this child dog food. Is that true? At some point. Well, that's in evidence. Yes, but I would have to say that was somewhere in an interrogation after three interrogations. And weren't they watching a movie together, the two of them? Afterwards. Well, at 2 a.m. or whenever the mother came home. Afterwards, all right, so he was watching a movie after. All right. So how does that go to his pre-crime intent? Well, it's inconsistent with an assertion that he hung out primarily in his room with the door shut. Well, apparently they did. That was part of Sieber's testimony. Sieber said that he stayed in his room most of the time. There's no showing that Alex didn't say, come and watch TV with me. I don't see how that goes to show that he aided and abetted a murder. What about the testimony from the friend that when a question was asked as to where the child was, there was a guilty glance between the two of them? Yeah, I've been trying to figure out what a guilty glance is, a guilty look. But the jury, it's not for us to determine whether or not that evidence was communicated to the jury if the jury used that to impute culpability. Well, I'm not sure what a guilty look is. Okay, so he looked guilty. No, it's changed a glance. The testimony was when there was a question, where is the baby? Where is the toddler? Mikey, I think was his name. Where is he? That the two of them looked at each other. Well, I think it shows that they looked at each other because I think, I don't think there's any question that Mr. Cox knew what was going on. Okay, he knew what was going on. Mendoza maybe talked to him, but there's no showing that he had anything to do with aiding and abetting the killing, aiding and abetting the beating that occurred on that night. I mean, the ample evidence, the court finds, okay, Cox was present. Well, even if he were simply there and watched it all, wouldn't that conceivably be sufficient to establish aiding and abetting? No, because he didn't have a duty to intervene. I thought he was, he had care and custody. Did he not? No. In fact, the mother never gave him care and custody. Well, that's not the question. The question is whether he assumed care and custody because he testified that he had cut a blister off his foot, that he tripped him once when he took a picture, and that he spanked him once. So that's assuming, according to the Court of Appeal, and I'm not sure that that's unreasonable, that was an assumption of care and custody. If you take the initiative of providing care or discipline. I don't know. I'm thinking because if I live in a house and somebody brings their child there, and at some point I give them some medical aid or at some unknown point, because this was all part of subsequent interrogations after three interrogations. So I give the child some discipline or whatever that I'm assuming for the rest of the child's life or the rest of the child, any time the child visits. This was not a long period of time. This occurred over a month. Isn't that true? It wasn't like years and years and years. I believe it was a three-month period. Right. Wasn't the blister just a few weeks or a few days prior to this event, the cutting off of the blister? The blister came, it was about a week ago. He came back and had a blister from a burn when he was with his grandparents. Right. So my problem is that, which I have, is that look, I mean the police interrogated him and talk about, I know the respondent says things about alternative scenarios in putting together an alternative scenario. Here they've interrogated him, and at some point, in some context, he said something like that. He was clearly intellectually challenged. He was shy. He was slow. See, I question those interrogations, and that's why it was so important for me to do the motion for a new trial and be able to get the experts. But there's never been a finding that the statements were involuntary or coerced. Has there? Well, there hasn't, which is why I would have liked to do a motion for a new trial on this case and bring in experts, which I couldn't do, which I think I clearly couldn't do. So I agree there was some testimony about what happened afterwards. There was testimony that he lived in the house, that he was friends with Mendoza. He knew Mendoza. He didn't tell anybody. That's what the court of appeal found. But there was clearly, he was clearly never allowed to assume. Assume is when someone says, as far as I understand it, someone says, okay, well, you take care of my child when you watch my child for a minute, and he clearly didn't do that. He clearly lived in the house. There was evidence that he was terrified of this Mendoza, and it is. The horrific nature of this crime that he got swept up into this thing. And I'd just like to save a little for rebuttal. And another thing is that the prosecutor, I think, in his inconsistent arguments, even knew that Mr. Cox, that Riggi didn't have anything to do with it. He knew it was Mendoza. But because of the passion and the fury about what happened, they brought in Cox because he didn't do anything about it. And so I think that that's why we're here. But the prosecutor never argued in Mendoza's trial that Cox had anything to do with this. He knew it was Mendoza. But he doesn't have to. I mean, he doesn't have to actually inflict the injury that ultimately led to the death of the child. But if he aided, abetted, encouraged it in any way, you know, by lending support, even verbally. I don't know. Well, according to the aiding and abetting statute, and I did want to save some time, according to that, he has to have an intent. He has to intend to encourage him. There's no showing where he was while this was going on. He did see it. He knew about it. He lived in the house. But he didn't do anything about it. And that is not aiding and abetting under the California statute. You've got about a minute and a half, counsel. You may do so. Thank you. Thank you. Deputy Attorney General Matt Mulford, may it please the court. I confess I really don't know where to begin with this case. The evidence is that Mr. Cox and Mr. Mendoza worked together. They lived together. They talked together. They drank together. They went to the video store together. They watched movies together. And they tortured a three-year-old boy to death together. The evidence is sufficient. There were no inconsistent theories. The continuance was granted many times before it was ultimately denied. And in the seven and a half years since, we haven't seen anything that suggests there would have been a difference had a continuance been granted one more time. Unless there are questions, I'll submit. Well, what's your response to opposing counsel's position that the fact that her client knew that the torture was going on does not implicate him in terms of his intent? What's your response to that? That's a jury question. And it was resolved adversely to her client by a jury. Was there sufficient evidence to support that jury verdict? What's the evidence that supports the jury's verdict that he aided and abetted the torture? Mr. Cox admitted cutting the blister. So the boy suffered a blister when he was visiting. His grandparents stepped on a charcoal briquette, so his foot was blistered. There is testimony that Mr. Cox used a razor to cut that blister off, and then Mr. Mendoza used a butane lighter to inflict a burn to that razor-cut area. The two of them did it together. Mr. Cox admitted that when the boy was lying in his bed, profusely sweating and drooling, that he changed the sheets for the boy. He admitted spanking him on five or six occasions. He admitted tripping him. All of those acts, which he admitted doing, lead to the inference that he intended to help Mr. Mendoza. But I also believe the inference that he did it himself. They worked together and killed the boy. Is that sufficient evidence? Mr. Arfa's arguments didn't persuade a jury, and they should be far less persuasive today. What's your response to the argument about the government presented different theories at the two different trials? The magistrate judge said that, no, they did not. It's difficult to talk about the concepts of differing moral culpability in this case, but it's probably true that Mr. Mendoza shared more or a higher degree of moral culpability. But those words are hard to express. We're talking about the death of a 3-year-old who was tortured. So obviously the words used at two different trials would be different, especially when Mr. Mendoza appears to be the more culpable of the two. But that's not inconsistent, and even if it was, that's not a problem for any of these courts. Anything further? Please affirm. Thank you, counsel. Ms. Arfa, you have some reserve time. Yes. The prosecution focuses on statements by Mr. Cox saying that he engaged in certain behaviors. Think about the blister. What he said was there was a loose piece of skin that he cut off and then he put ointment on it. Okay, so how does that get him to a murder, eating and abetting a murder? Well, the jury may not have believed him. Well, that he put his ointment on? He may have believed the scenario that you just heard Mr. Mulford say. That he burned it off? There was no evidence that he burned it off. That Mendoza and he working together, that he cut the blister and Mendoza used a torch to burn it at the same time. No, there was no evidence of that. There was no evidence. The blister was cut on a different day. There was no evidence the blister was cut on the day that he tortured and killed him. This was not- No, on the day that the blister was cut. That- I honestly- I mean, the jury could have believed, I mean, if there was testimony that on the same day that the blister was cut off that Mr. Mendoza used a torch to burn it. Was there evidence in the record to that? None that I could see that he burned the blister. There was evidence that he- That he burned his foot, that he burned the baby's foot. No, as far as I remember. And that there was evidence that I think he burned his genitalia. Mendoza did put a match, but not on the foot. That was- not that I recall. So, I don't see anything about the facts to say anything about that. And I understand what the jury may have believed. But the test is whether the California Court of Appeal is a reasonable application of facts to the law of sufficiency of the evidence. And how is that reasonable to implicate Mr. Cox in a torture murder according to their findings? There was no showing on that night that he had anything to do with it. And they weren't- he wasn't working in tandem with him. He was just there because he lived there. I mean, he was there. They played ball together. It was Mendoza who hit Mickey with the ball. It wasn't- Cox that did anything. In fact, Siebert never saw him do anything. And, in fact, specifically did not give him custody. So, I'm sorry. So, we'd ask the court to clearly look at what the Court of Appeal found. Their findings, which were clearly unreasonable in light of what went on that night. All right. Thank you, counsel. Thank you. Your time has expired. The case just argued will be submitted for decision. And we will hear argument next in Pena v. Holder.
judges: Gleason, O'SCANNLAIN, RAWLINSON